# EXHIBIT A

IN THE DISTRICT COURT OF THE U.S. VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

SPARTAN CONCRETE PRODUCTS, LLC,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀)⠀⠀⠀⠀CASE NO. 3:15-cv-00004
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀vs.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀ACTION FOR ANTITRUST
ARGOS USVI, CORP. f/k/a⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀VIOLATIONS & DAMAGES
CARICEMENT USVI, CORP.,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Defendant.⠀⠀⠀)
_____)

# AMENDED ANSWER AND COUNTERCLAIM FOR VIOLATIONS OF THE SHERMAN ACT AND THE VIRGIN ISLANDS ANTIMONOPOLY LAW

COMES NOW Defendant, Argos USVI, Corp. f/k/a Caricement USVI, Corp. (hereinafter "Defendant"), by and through its undersigned counsel, pursuant to Federal Rules of Civil Procedure 12 and 13, and in response to Plaintiff's Complaint, respectfully submits this Amended Answer and Counterclaim alleging violations of the Sherman Act by Spartan Concrete Products, LLC ("Spartan"), Warren Mosler ("Mosler"), and Michael Pede ("Pede") (collectively, "Counterclaim Defendants").

## AMENDED ANSWER

Argos hereby adopts its Answer (Docket No. 7), filed on March 13, 2015, in response to Spartan's Complaint alleging a single cause of action under the Robinson-Patman Act, 15 U.S.C. § 13(a), as if fully stated herein.

## NATURE OF THE COUNTERCLAIM

1.      This is a counterclaim for violations of the Sherman Antitrust Act and the Virgin Islands Antimonopoly Law based on a *per se* illegal market division agreement entered into by Spartan.  Counterclaim Plaintiff Argos USVI, Corp. discovered the facts supporting this counterclaim during the discovery conducted in this matter.

2.      The facts discovered during discovery demonstrate clearly that Spartan engaged in a price war on the islands of St. Croix and St. Thomas for many years, regularly undercutting on price its main competitor for the sale of ready-mix concrete, Heavy Materials, LLC ("Heavy").  Spartan's intent, which it stated several times, was to attain a monopoly in the ready-mix concrete market in the U.S. Virgin Islands by either driving Heavy out of the concrete business or forcing Heavy to enter into a purchase or sale transaction with Spartan.  Spartan's specific goal when it obtained a monopoly was to increase the prices of ready-mix concrete and reduce its purchase prices for the components to produce concrete, which would generate significant profits for Spartan.  Spartan, Mosler, and Pede achieved their monopolization goal in December 2013 when they entered into and implemented an agreement with Heavy to eliminate all competition between them and divide up the concrete market, with Spartan taking the concrete business in St. Croix and Heavy Materials taking the concrete business in St. Thomas.  This market division agreement was reduced to writing—in a Requirements Supply Agreement relating to St. Croix and an Amendment to Lease relating to St. Thomas—and signed by the principals of both companies.  Once Spartan and Heavy signed the written agreements, Spartan immediately ceased operating in St. Thomas and Heavy simultaneously ceased operating in St. Croix.  Prices for ready-mix concrete rose on both islands immediately after the agreement was reached, and Spartan obtained the ability to

2

control prices for its key raw materials.  Through this horizontal market restraint, Spartan and Heavy were able to completely eliminate and end all competition between them in the ready-mix concrete market in the U.S. Virgin Islands.  Mosler and Pede arranged, negotiated, entered into and carried out this market division agreement on behalf of Spartan.  Counterclaim Defendants' conduct in entering into this agreement allocating and dividing up the markets, territories, and customers for ready-mix concrete constitutes a *per se* violation of the Sherman Act and the Virgin Islands Antimonopoly Law.

3.      Section 3 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any Territory of the United States . . . is declared illegal."  15 U.S.C. § 3.  Section 3 applies Section 1 of the Sherman Act to the U.S. Virgin Islands.  An agreement violates the Sherman Act when it unreasonably restrains trade, and market division agreements are one of the types of conduct "thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused."  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984).

4.      The Virgin Islands Antimonopoly Law is violated by any person who "make[s] any contract with, or engage[s] in any combination or conspiracy with" a competitor "allocating or dividing customers, territories, sales, or markets, functional or geographical, for any commodity or service."  11 V.I.C. § 1503.  The Virgin Islands Antimonopoly Law explicitly adopts the interpretations of the Federal Courts where "the language…is the same or similar to the language of a Federal Antitrust Law."  11 V.I.C. § 1518.

5.      Spartan's agreement to divide up the ready-mix concrete market in the Virgin Islands is a *per se* illegal agreement in violation of the Sherman Act and the Virgin Islands Antimonopoly Law.  As the Supreme Court has stated, "an agreement between competitors at

3

the same level of the market structure to allocate territories in order to minimize competition" is a "classic" example of a *per se* illegal agreement.  *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49 (1990).  Horizontal market division agreements are "naked restraints of trade with no purpose except stifling of competition."  *U.S. v. Topco Associates, Inc.*, 405 U.S. 596, 615 (1972).

## THE PARTIES

6.      Counterclaim Plaintiff Argos USVI, Corp. is a corporation incorporated and having its principal place of business in the U.S. Virgin Islands.

7.      Counterclaim Defendant Spartan Concrete Products LLC is a corporation incorporated in the U.S. Virgin Islands.  Spartan ceased its ready-mix concrete operations on or around October 28, 2015, when it was acquired by U.S. Concrete, Inc.

8.      Counterclaim Defendant Warren Mosler is the principal owner of and investor in Spartan Concrete Products, LLC.

9.      Counterclaim Defendant Michael Pede is an employee of Valance Co., which provided management services to Spartan.  Pede served as the general manager of Spartan and was primarily responsible for the daily decisions and operations of Spartan.

## JURISDICTION & VENUE

10.      This Court has jurisdiction over this counterclaim pursuant to 28 U.S.C. §§ 1331, 1337, 1367(a), and Section 4 of the Clayton Act, 15 U.S.C. § 15.

11.      Venue is proper in the District of the Virgin Islands pursuant to 15 U.S.C. §§ 15, 22, and 28 U.S.C. § 1391(b) and (c), because Counterclaim Defendants reside, transact business, maintain offices, and are otherwise found in this District.

12.     This Court has personal jurisdiction over the Counterclaim Defendants because they have availed themselves of this forum and moreover have engaged in an illegal market division scheme that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business in this District.

13.     The Sherman Act extends federal subject matter jurisdiction to conspiracies and contracts "in restraint of trade or commerce in any Territory of the United States."  15 U.S.C. § 3(a).  "There is no question that Congress has the power to apply the Sherman Act to" territories such as the U.S. Virgin Islands.  *United States v. Standard Oil Co.*, 404 U.S. 558, 559 (1972) (*per curiam*); *see also L & J Crew Station, LLC v. Banco Popular de Puerto Rico*, 278 F. Supp. 2d 547, 557 (D.V.I. 2003) ("Section 3 is the exact counterpart of section 1 and is made expressly applicable to the territories and the District of Columbia.").  The conduct at issue in this counterclaim relates to the sale of ready-mix concrete in the U.S. Virgin Islands and as such is clearly commercial in nature.  At all times relevant to this counterclaim, Counterclaim Defendants were engaged in the sale of ready-mix concrete in the U.S. Virgin Islands, in this judicial district.

## RELEVANT MARKET

14.     The relevant product market in this case is the sale of ready-mix concrete.  Ready-mix concrete is a perishable good, made by combining water, cement, and "aggregates" such as stone and/or sand.  Ready-mix concrete is a vital component of almost all infrastructure projects, and is used extensively in a wide range of industries, including construction and paving.

15.     The relevant geographic market is the territory of the U.S. Virgin Islands, which consists of the islands of St. Thomas, St. John, and St. Croix.  Surrounded by water on all sides, this market is both distinct and well-defined.

16.     There are no reasonable substitutes for ready-mix concrete in this market.

17.     Due to the threat of hurricanes and other inclement weather, as well as the land topography, buildings in the U.S. Virgin Islands must meet strict code requirements designed to ensure they can withstand harsh conditions.  For this reason, ready-mix concrete is a necessary element of almost all residential, commercial, and industrial construction in the U.S. Virgin Islands.  It cannot be replaced—either practically or legally—with less structurally sound building materials.

18.     Ready-mix concrete not only performs well in a variety of conditions, its price ensures it is available to a wide range of the population.  No other building material offers the same quality, functionality and performance as ready-mix concrete at as competitive a price.

## BACKGROUND FACTS

**I.     Spartan Initiated a Price War with Heavy Materials in Both St. Croix and St. Thomas**

19.     On or around April 4, 2007, Spartan began operations as a ready-mix concrete company selling exclusively on the island of St. Croix.  From approximately April 2007 until December 2013, Spartan and Heavy were competitors for the sale of ready-mix concrete in St. Croix.

20.     Spartan initiated a price war in St. Croix by entering the market at a lower price point and continuing to undercut Heavy on price.  When Spartan entered the ready-mix market in St. Croix, it was selling concrete at as much as $30 per cubic yard less than its only competitor, Heavy.

21.     Upon information and belief, Spartan began selling ready-mix concrete on the island of St. Thomas in late 2010 or early 2011, after entering into a lease to operate the No. 1 Concrete batch plant in St. Thomas.  From approximately July 2010 until December 2013, Spartan and Heavy were competitors for the sale of ready-mix concrete in St. Thomas.

22.     Spartan's price war in St. Croix had driven prices significantly lower but had not resulted in Heavy withdrawing from the market.  Spartan had not previously been selling in St. Thomas, but Spartan decided to start selling concrete in St. Thomas and to bring the price war with Heavy to St. Thomas.  Starting from a position of no market share meant that Spartan had to be even more aggressive in its pricing strategy in St. Thomas.

23.     Spartan started selling ready-mix concrete in St. Thomas at a lower price than its only competitor, and in much the same fashion as occurred in St. Croix, Spartan continued to undercut Heavy on price.

24.     When Spartan entered St. Thomas at the end of 2010 or early 2011, it began selling ready-mix concrete for approximately $150-160 per cubic yard when Heavy was selling at the time for approximately ██ per cubic yard.  Each time that Spartan would initiate a price reduction, Heavy would respond by reducing its price as well.

25.     When Spartan began selling ready-mix concrete market in St. Thomas, its only competitor was Heavy.  Spartan and Heavy were the only companies capable of competing in the market for the sale of ready-mix concrete to residential and commercial customers, and they were operating from the only two batch plants on the island of St. Thomas.  To the extent there were any other ready-mix concrete suppliers in the Virgin Islands at the time, none was capable of competing on a significant scale.

26.     By 2013, Spartan had driven ready-mix concrete prices in St. Thomas down from approximately $165 or $170 per cubic yard to as low as approximately $120 or $110 per cubic yard.  Testimony from Spartan's Rule 30(b)(6) witness confirms these facts:

> "Did we [Spartan] go below 150 at some point? Certainly."[1]

> "[D]id we [Spartan] sell concrete for less than for $135 a yard lower? Yes, we did."[2]

> "[Q:] Do you recall sometime after 2011 where Spartan further decreased its price to as low as $125 per yard? [A:] I think we got that low."[3]

27.     Spartan's own Rule 30(b)(6) witness testified that the price war resulted in a decrease in prices between 2010 and 2013 of approximately 25-30% from the level before Spartan began competing with Heavy.[4]  Spartan's Rule 30(b)(6) witness also testified that this was "a price war;" one that resulted in Spartan losing money each year and ended only when Spartan ceased operating in St. Thomas.[5]

28.     Spartan used the price war as a tactic to accomplish its goal of obtaining a monopoly by pressuring Heavy to get out of the concrete business, to buy Spartan at a premium, or to sell itself to Spartan at a discount.[6]  Mosler subsidized multiple years of Spartan's lost profits in an effort to drive Heavy out of the concrete business or to the

---

[1] Deposition of M. Pede, at 191:20-191:21.

[2] Deposition of M. Pede, at 193:15-193:16.

[3] Deposition of M. Pede, at 193:22-193:25.

[4] Deposition of M. Pede, 38:1-38:11 ("Q: Okay. So from 2010 to 2013, the price that Spartan was charging was reduced from either high 150s or low 160s to the high 120s, correct? A: That's correct. I mean –and just to clarify, those ranges are important because you have –you always are required to have a very wide variety of concrete which has very different cost inputs, and so, there is. But on a general sense, if you just want to call that, you know, 25 to 30 percent decrease from commencement of operation to ceasing operation, that's a good approximate.").

[5] Deposition of M. Pede, 41:10-41:18 ("Q: Did Spartan view that circumstance as a price war with Heavy Materials? A: It was a price war. Q: Did Spartan lose money because of that price war year-to-year? A: Yes. Q: Did that price war with Heavy Materials ever stop in St. Thomas? A: It stopped when we ceased business.").

[6] *Heavy Materials, LLC v. Jason Masino*, Case No. 3:12-cv-0002-CVG-RM, First Amended Complaint, Docket No. 27 (Aug. 3, 2012), at ¶ 33.

negotiating table where Spartan planned to extract either a favorable acquisition or an agreement to divide the market—either way resulting in Spartan obtaining a monopoly in the sale of ready-mix concrete.

29.     The price war drove prices down to a level where Spartan required multiple injections of money to keep the company from failing—all in service of the price war Spartan initiated and carried out with Heavy.

30.     Mosler told Spartan co-owner Rodger Bressi that his goal was to break Heavy's back and that he would spend as much as $5,000,000 a year through the price war to do that.

31.     Mosler devised Spartan's price war strategy and personally supervised its execution, with assistance from Pede.

32.     ████████████████████████████████████████
████████████████████████████████████████████

33.     On January 25, 2011, Mosler met with the principals of Heavy in St. Thomas. During this meeting Mosler suggested that Heavy cease ("park") its ready-mix concrete business to focus on selling stone and other aggregate products.  As Spartan's Rule 30(b)(6) witness recognized, "ultimately parts of whatever was proposed [at this meeting]….are, you know, what ended up happening."[7]  Heavy did not agree to Spartan and Mosler's demands after the January meeting, so Spartan again decreased its prices as a part of its price war strategy in approximately March of 2011.

---

[7] Deposition of M. Pede, at 190:4-190:21 (Q: "Did Mr. Mosler ever make any comments to you to the effect that Heavy Materials should just focus on selling stone and aggregate, and Spartan should sell concrete, and then the company should structure the market that way? Mr. Kroblin: Objection; form. The Deponent: I don't –I mean I don't recall any specific conversation about that. Q: You don't recall him ever saying anything like that to you? A: In 2011, no. Q: Or later? A: I mean, ultimately parts of whatever was proposed or said to be proposed are, you know, what ended up happening, so I don't know if that happened in the context of negotiating the Requirements Supply Agreement or whenever.").

34. 

35.

36.     In November 2011, at yet another meeting between the competitors, Mosler "bluntly" told Gurlea that it made no sense to have two concrete companies competing for the Virgin Islands market and, therefore, either Heavy Materials had to purchase Spartan or Spartan had to purchase Heavy.  Heavy did not agree to Mosler's request so, following this meeting, Spartan again decreased its prices as part of its price war strategy.

37.     Mosler's monopolization strategy was to approach Heavy on multiple occasions with offers to divide the market or to arrange an acquisition of one company by the other, with another price cut following each time his offer was rebuffed.

38.

The price war resulted in Spartan selling concrete below cost on both islands – in some cases by as much as $20 or $30 below cost for each cubic yard of concrete.

39.     In the fall of 2013, Spartan and Heavy met multiple times to negotiate an agreement between the parties that would end the price war in the Virgin Islands and enable Spartan to obtain the monopoly it desired.  As Spartan's Rule 30(b)(6) witness testified in

December 2013, Heavy agreed to cease selling concrete in St. Croix and Spartan agreed to cease its concrete operations in St. Thomas.[8]

## II.     Spartan Entered Into an Agreement to Divide the USVI Market

### a.     Spartan Ceased Competing in St. Thomas in December 2013

40.     The price war ended in St. Thomas in December 2013, when Spartan ceased operating the No. 1 concrete batch plant in St. Thomas.

41.     The cessation of competition in St. Thomas was accomplished by a written agreement executed by Spartan, Heavy, and the landlord (No. 1 Concrete) on December 13, 2013 titled "Amendment to Lease, Assignment and Assumption of Lease and Landlord's Consent and Estoppel" ("Assignment of Lease").[9]  This agreement was negotiated and entered into by Mosler and Pede on behalf of Spartan.

42.     The Assignment of Lease reflected in writing the agreement between Spartan and Heavy that Spartan would withdraw from the ready-mix concrete business in St. Thomas. Spartan has not sold ready-mix concrete in St. Thomas since entering into this agreement with Heavy.

---

[8] Deposition of M. Pede, at 123:18-124:21 ("Q: Were you involved in those discussions or negotiations with Heavy Materials in the fall or early winter of 2013? A: I was. Q. You said you— A: I was. Q: Okay. Who did you speak to at Heavy Materials about that? A: I recall maybe a meeting or two including the Brunts, but the vast majority of my conversations were with Doug Gurlea. Q: Were those conversations in person or by phone, or both? A: Both. Q: And was Mr. Mosler present during some or all of those meetings or conversations? A: Some Q: As a result of those meetings or conversations with the representatives of Heavy Materials, was an understanding or agreement reached between Spartan and Heavy Materials as to Heavy Materials sales of concrete in St. Croix? A: Was there agreement on Heavy Materials sales of concrete in St. Croix? Q: Yes. A: Yes. Q: What was that agreement? A: That they would cease selling concrete in St. Croix."); 126:3-126:9 ("Q: So he decision was made to stop selling in St. Thomas at the same time, correct? A: We made that decision. Q: All right. Was that decision discussed with the representatives of Heavy Materials during these negotiations about sales in St. Croix? A: Yeah, I'm sure it came up. Yes"); 128:19-129:10 ("Q: Did Doug Gurlea or anybody else from Heavy Materials ask you for an assurance or a commitment that Spartan wouldn't continue to sell concrete in St. Thomas when they were stopping sales in St. Croix? A: I don't recall an assurance, no. Q: But did they ask you what you were intending to do? A: With St. Thomas? St. Croix? Q: With St. Thomas. A: St. Thomas? Q: Yeah. A: Yeah. Q: And you indicated that you were going to stop selling in St. Thomas? A: Well, we had to. You know, we assigned the lease to them").
[9] 000198- 000201 00735.030.001 (hereinafter, "Assignment of Lease").

43.     The Assignment of Lease stated that "Seller [Spartan] entered into a Business Lease with the Landlord [No. 1 Concrete] dated July 22, 2010" for the No. 1 Concrete batch plant on the island of St. Thomas.[10]  It further stated that "Seller [Spartan] has agreed to assign to Purchaser [Heavy Materials] the Lease pertaining to the Leased Premises."  This meant that Heavy would take over the batch plant from which Spartan had previously been selling ready-mix concrete.

44.     After the Assignment of Lease was executed, St. Thomas went from an island with two competing suppliers of ready-mix concrete to one.

45.     Through the Assignment of Lease, Spartan agreed not to produce ready-mix concrete in St. Thomas because it was assigning to Heavy the right to operate the only other batch plant capable of competing with Heavy in St. Thomas.

46.     After the Assignment of Lease was executed, Heavy was in control of the only two batch plants capable of producing significant volumes of ready-mix concrete in St. Thomas, effectively foreclosing any competition for the term of the lease.  Since this agreement with Spartan, Heavy has operated the former Spartan batch plant in St. Thomas as a back-up to its main plant.

**b.     Heavy Ceased Competing in St. Croix in December 2013**

47.     Heavy ceased its ready-mix concrete operations in St. Croix in December 2013.  Heavy has not sold ready mix concrete in St. Croix since that date.

48.     The cessation of competition in St. Croix was accomplished through a written agreement executed by Spartan and Heavy on December 15, 2013 titled "Requirements

---

[10] Assignment of Lease, at 1, ¶ Recitals A.

Supply Agreement" ("RSA").[11]  The RSA reflected in writing the agreement between Spartan and Heavy that Heavy would withdraw from the ready-mix concrete business in St. Croix.

49.     The execution of the RSA for St. Croix took place a mere two days after the execution of the Assignment of Lease for St. Thomas. ██████████████████

███████████████████████████████████████████████████████████

███████

50.     The RSA stated that "Vendor [Heavy Materials] has agreed to sell to Buyer [Spartan] the products described in Schedule A...for use in Buyer's production and sale of ready-mix concrete on St. Croix, U.S. Virgin Islands (the "Buyer's Business") under the terms and conditions contained herein."[12]  Essentially, Heavy agreed to sell to Spartan all of its requirements of stone and sand for the production of concrete in St. Croix.

51.     In return, the RSA further provided that "[s]o long as this Agreement remains in effect, the Vendor [Heavy Materials] (either directly or through any person or entity 'affiliated' with Vendor or any of its current owners) agrees not to supply ready-mix concrete on the island of St. Croix."[13]

52.     The RSA went into effect on December 15, 2013 and was intended to continue through October 31, 2018 with the potential to be extended until October 31, 2028 upon either party's exercising of two five-year options to extend.[14]

---

[11] 000489 - 000496 00735.030.001 (hereinafter, "Requirements Supply Agreement").
[12] RSA at 1.
[13] RSA at 4, ¶ 7.
[14] RSA at 1, ¶ 1.

53.   After the execution of the RSA, Heavy ceased its concrete operations in St. Croix and St. Croix went from an island with two competing suppliers of ready-mix concrete to one monopoly supplier.

### c.   The Cessation of Competition in December 2013 Was Part of a *Per Se* Illegal Market Division Agreement

54.   Before the Amendment of Lease and RSA were signed in December 2013, Spartan and Heavy discussed their plans and intentions regarding both St. Croix and St. Thomas.  Mosler and Pede participated in those discussions, and authorized and approved both agreements.  The signing of the agreements resulted in the division of the ready mix concrete market in the U.S. Virgin Islands with Spartan taking St. Croix and Heavy taking St. Thomas.

55.   This market division agreement was the culmination of almost two years of concerted effort by Spartan, Mosler and Pede to drive the prices of ready-mix concrete down so low in St. Thomas and St. Croix that Spartan would be able to eliminate competition from Heavy and gain a monopoly.

56.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████

57.   ████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████



58.    Doug Gurlea did in fact ███████████████████████████

███████  reach an agreement with Spartan and to execute the RSA and the Amendment to

Lease.

59.    ███████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

60.    In December 2013, Spartan ceased selling concrete in St. Thomas and Heavy

ceased selling concrete in St. Croix.

61.    ██████████████████████████████████

████████████████████████

62.    Spartan's Rule 30(b)(6) witness described the essence of the agreement between

Spartan and Heavy Materials:

> "We agreed that Spartan St. Croix would get St. Croix.  We agreed that
> Spartan St. Thomas would cease to do business."[15]

---

[15] Deposition of M. Pede, at 156:24-157:1 ("The Deponent: We agreed that Spartan St. Croix would get St. Croix. We agreed that Spartan St. Thomas would cease to do business"); *see also* Deposition of M. Pede, at 162:7-163:3 (Q: Okay. So this indicates that for as long as this agreement is in effect, whether it's for five years, for 2018, or 15 years, through 2028, Heavy Materials agreed not to sell ready-mix concrete on the island of St. Croix, correct? A. Correct. Q. So Heavy Materials agreed that as of December 15, 2013, for at least five years and possibly 15 years, it would stop competing with Spartan for the sale of concrete in St. Croix, correct? A: Same question you just asked. Q: Is that – A: It would stop supplying ready-mix, yes. Q: And at the same time that this agreement went into effect, Spartan stopped competing with Heavy Materials for sale of concrete in St. Thomas, correct? Mr. Krobin: Objection. You can answer. The Deponent: At the same time Spartan St. Thomas ceased to do operation.").

63.     Spartan's former Managing Member, Rodger Bressi ("Bressi"), described the simultaneous cessation of operations by Spartan and Heavy as Mosler's desired end to the price war and an end to competition between the two companies.

64.     Bressi also had a conversation with Mosler after the agreement was entered into with Heavy in which Mosler made clear that dividing the Virgin Islands concrete market was the intended effect of the price war initiated by Spartan.

### III.    Spartan's Agreement to Divide the Market Enabled It to Obtain a Monopoly in St. Croix

65.     From 2010 to 2013, Spartan and Heavy were competing in the ready-mix concrete market in the U.S. Virgin Islands with operations in both St. Croix and St. Thomas.

66.     Immediately after the market division agreement was reached in December 2013, Spartan achieved a monopoly over the ready-mix concrete business in St. Croix and prices for ready-mix concrete increased in both islands.

67.     Spartan's Rule 30(b)(6) deponent acknowledged that Spartan increased prices to its customers in St. Croix after the RSA was executed, and that Spartan continued to increase prices through 2015.[16]

68.     Spartan accomplished its first price increase after December 2013 by enforcing list prices that had been routinely discounted during the price war.  After customers who had been paying negotiated rates were brought up to list prices, Spartan began increasing the list prices as well.

---

[16] Deposition of M. Pede, at 203:9-203:19 ("Q: So as a general proposition, it's correct that after the Requirements Supply Agreement was entered into with Heavy Materials in December of 2013, the prices to Spartan's customers in St. Croix increased? Mr. Kroblin: Object. The Deponent: Yes. By Mr. Feller: Q: And they continued to increase in 2015, correct? A: Yes").

69.     On or around January 1, 2014, only 2 weeks after the agreement with Heavy, Spartan distributed to all of its customers in St. Croix a new price list implementing a price increase of approximately 10%.  Spartan's Rule 30(b)(6) witness stated that the purpose of this price increase was to "increase revenue."[17]  This was the first price list Spartan had issued in three or more years.

70.     The changed circumstances in the ready-mix concrete market in the U.S. Virgin Islands were clear: 3,000 psi "Big Rock Regular" was now ████ per cubic yard.  This was a significant increase in price for Spartan compared with the low prices charged during the price war.

71.     ████████████████████████████████████████████████████
████████████

72.     In merely one example of many customers who were immediately harmed by higher prices for ready-mix concrete as a result of the illegal market division agreement, Spartan charged its customer "Fernro" $135.00 per cubic yard on December 3, 2013, and then for the exact same product charged $167.00 on January 7, 2014.  This represented an increase of almost 25% of the pre-agreement price.

73.     █████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████

---

[17] Deposition of M. Pede, at 183:14-183:16 ("Q: Okay. So what was the reason for the price increase at that time? A: Increase revenue.").

74.     Bressi knew that the price of concrete went up immediately in both St. Thomas and St. Croix because customers started calling him to complain about the actions taken by his former employer.

75.     Bressi estimated that before December 2013, the average price of concrete in St. Croix was approximately $125 per cubic yard (though it also dipped to $110), and after the agreement Spartan's average price was increased to $160 per cubic yard.  In St. Thomas, he estimated prices were approximately $135-140 per cubic yard, and after the agreement Heavy's average price was increased to $180-187.  This returned or nearly returned prices to their pre-price war levels.

76.     ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

77.     It is clear that the reason for and the effect of the agreement reached by Spartan with Heavy in December 2013 was to eliminate competition and obtain a monopoly in the ready-mix concrete market in St. Croix so that prices and profits could be driven up.  Mosler stated explicitly in an email to Pede during the course of negotiations with Heavy that he saw the St. Thomas business as a loser to be discarded in return for getting a monopoly and the ability to raise prices in St. Croix.

## IV.     Spartan's Agreement to Divide the Market and Obtain a Monopoly Had Clear Anticompetitive Effects

78.     As detailed above, Counterclaim Defendants' conduct in entering into the market division agreement has had clear and significant anticompetitive effects.  A formerly competitive market for ready-mix concrete that was characterized by vigorous competition on

price by two companies active on both islands was reduced to two monopolies, each with control of one island. Counterclaim Defendants' conduct excluded competitors, eliminated competition, resulted in a monopoly, and restricted customer choice in the U.S. Virgin Islands. Spartan's goal was to monopolize the concrete market which would give it control over the sales prices for concrete as well as the purchase prices for the components to produce concrete. In other words, Spartan's ultimate goal was to increase its prices and at the same time reduce its costs so that it could reap monopoly profits. Customers of ready-mix concrete saw immediate and lasting price increases after the market division agreement went into effect.

79.     As a direct, substantial, proximate and immediate result of Counterclaim Defendants' anticompetitive and unlawful conduct, competition for the sale of ready-mix concrete and for the purchase of cement in the U.S. Virgin Islands has been harmed, foreclosed and eliminated.

80.     Counterclaim Defendants' conduct in entering into the market division agreement resulted in competitive harm to Argos and other suppliers of cement to the U.S. Virgin Islands market. Prior to the illegal market division agreement, Argos was selling cement on both islands. In St. Thomas, Argos was selling to both competing ready-mix concrete companies. And in St. Croix, Argos was selling regularly to Heavy Materials and occasionally to Spartan. After the illegal market division agreement, Argos completely lost a customer and lost sales in both St. Croix and St. Thomas. Argos's overall sales volumes decreased in 2014, 2015 and to date in 2016 compared to the preceding years.

81.     Also, after the illegal market division agreement, Argos was left with a single monopoly customer for its cement in the Virgin Islands. Spartan and Heavy Materials each

gained significant buying power as a customer of bulk cement.  This created the likelihood for the exercise of "monopsony" power which would depress cement prices below profitable levels.

82.     Counterclaim Defendants' conduct has resulted in monopoly outlets for Argos's products and the products of other cement suppliers, and an overall decrease in sales volumes resulting from the elimination of competition and elimination of a customer.  Through collusion with its primary competitor and creation of a monopoly, Spartan has the power to depress cement prices below profitable levels.  As a direct, substantial, proximate and immediate result of Counterclaim Defendants' anticompetitive and unlawful conduct to divide the market and obtain a monopoly, Argos has been injured in its business, property, trade, and competitive position in an amount to be established at trial.  Argos' injuries are an essential component of and directly intertwined with Spartan's monopolization of the concrete business.

**COUNT I**

**Violation of Section 3 of the Sherman Act, 15 U.S.C. § 3, Agreement in Restraint of Trade**

**(Spartan Concrete Products LLC, Warren Mosler, Michael Pede)**

83.     Argos incorporates all of the above paragraphs as if fully set forth herein.

84.     Counterclaim Defendants have imposed horizontal market restraints and engaged in conspiratorial conduct with a competitor to divide and allocate territories, markets, and customers in the ready-mix concrete market in the U.S. Virgin Islands in violation of Section 3 of the Sherman Antitrust Act, 15 U.S.C. § 3.

85.     Counterclaim Defendants entered into an agreement with a competitor to divide the market and obtain a monopoly, suppressing, eliminating, and preventing actual and potential competition, which constitutes a *per se* illegal agreement under the Sherman Act.

86.     The actual written agreements entered into in restraint of trade and in furtherance of the horizontal market division and allocation agreement, the Requirements Supply Agreement and the Amendment of Lease, are described above.

87.     As a direct, substantial, proximate and immediate result of Counterclaim Defendants' conduct, trade has been unreasonably restrained, a monopoly has been created, competition for both the sale of concrete and the purchase of cement has been eliminated, customers have paid more for ready-mix concrete, and Argos has suffered the injuries described above and will continue to suffer these injuries and damages in an amount to be proved at trial.

88.     The market division agreement has a direct and substantial effect on interstate and foreign commerce.

89.     Treble damages are appropriate pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

## COUNT II

**Violation of the Virgin Islands Antimonopoly Law, V.I. Code Tit. 11, § 1503(1)(c)**

**(Spartan Concrete Products LLC, Warren Mosler, Michael Pede)**

90.     Argos incorporates all of the above paragraphs as if fully set forth herein.

91.     Counterclaim Defendants' conduct in imposing a horizontal market restraint by entering into a market division agreement with a competitor also violates the Virgin Islands Antimonopoly Law.  V.I.C. § 1503(1)(c).

21

92.     Counterclaim Defendants entered into an agreement with a competitor to divide the market and obtain a monopoly, suppressing, eliminating, and preventing actual and potential competition, which constitutes a *per se* illegal agreement under the Virgin Islands Antimonopoly Law.

93.     The actual written agreements entered into in restraint of trade and in furtherance of the horizontal market division and allocation agreement, the Requirements Supply Agreement and the Amendment of Lease, are described above.

94.     As a direct, substantial, proximate and immediate result of Counterclaim Defendants' conduct, trade has been unreasonably restrained, a monopoly has been created, competition for both the sale of concrete and the purchase of cement has been eliminated, customers have paid more for ready-mix concrete, and Argos has suffered the injuries described above and will continue to suffer these injuries and damages in an amount to be proved at trial.

95.     The market division agreement has a direct and substantial effect on interstate and foreign commerce.

96.     Treble damages are appropriate and authorized by the Virgin Islands Antimonopoly Law.  11 V.I.C. § 1507.

## PRAYER FOR RELIEF

WHEREFORE, Argos prays the Court:

A.  Determine that Counterclaim Defendants' conduct as alleged in this Counterclaim was a *per se* illegal violation of Section 3 of the Sherman Act, 15 U.S.C. § 3, and the Virgin Islands Antimonopoly Law, VI Code § 1503(1)(c);

B.  Enter a joint and several judgment against Spartan, Mosler and Pede in favor of Argos;

22

C.  Award Argos treble damages in an amount to be determined at trial, plus interest in accordance with law;

D.  Award Argos its costs of suit, including reasonable attorneys' fees as provided by law; and

E.  Award such further and additional relief as is necessary to correct for the anti-competitive market effects caused by Spartan's unlawful conduct, as the Court may deem just and proper under the circumstances.

Dated: November 17, 2016                           Respectfully submitted,
                                                   LAW OFFICES OF BENNETT CHAN


                                    By:    /s/  *Bennett Chan*
                                           Bennett Chan, Esq., VI Bar # 258
                                           9800 Buccaneer Mall, Box #1
                                           St. Thomas, VI 00802-2409
                                           Tel: (340) 714-1998
                                           Email: chan@bclawvi.com


                                    By:    /s/  *Howard Feller*
                                           Howard Feller (*Pro Hac Vice*)
                                           MCGUIREWOODS LLP
                                           Gateway Plaza
                                           800 E. Canal Street
                                           Richmond, Virginia 23219
                                           Telephone: (804) 775-1000
                                           Email: hfeller@mcguirewoods.com

                                           *Attorneys for Defendant*

23

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of November, 2016, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will send a notification of such filling (NEF) to all counsel of record.

By:      /s/ *Bennett Chan*

Bennett Chan, Esq., VI Bar # 258
9800 Buccaneer Mall, Box #1
St. Thomas, VI 00802-2409
Tel: (340) 714-1998
Fax: (888) 291-7569
Email: chan@bclawvi.com